IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARRY DONACHY and BRUCE KINLEY, on behalf of themselves and others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:04-CV-245 ) |
| MOTION CONTROL INDUSTRIES, DIVISION OF CARLISLE CORPORATION, RETIREMENT PLAN FOR BARGAINING UNIT EMPLOYEES OF MOTION CONTROL INDUSTRIES, DIVISION OF CARLISLE CORPORATION, | ) ) ) Judge Sean J. McLaughlin ) ) ) ) ) ) |
| Defendants. | ) |

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Plaintiffs, Larry Donachy and Bruce Kinley, on behalf of themselves and others similarly situated, respectfully submit this Brief in support of their Motion for Summary Judgment.

**II.   BACKGROUND**

Defendant, Motion Control Industries, Division of Carlisle Corporation (hereinafter "Motion Control"), operated a manufacturing facility located at 1 Gillis Avenue, Ridgway, Elk County, Pennsylvania, 15853 (hereinafter the "Ridgway Facility"). Plaintiffs, Larry Donachy and Bruce Kinley, were actively employed by Motion Control at the Ridgway Facility until January 11, 2002. IUE/CWA Local 502, AFL-CIO (hereinafter "Local 502"), an employee organization, represented Donachy, Kinley, and Motion Control's other rank-and-file production and maintenance employees in collective bargaining. Donachy and Kinley are participants in the

Retirement Plan for Bargaining Unit Employees of Motion Control Industries, Division of Carlisle Corporation (the "Retirement Plan").

The Retirement Plan is maintained pursuant to a written document (the "Plan Documents"), consisting of a Plan Document, amended and restated effective January 1, 1997, and a Part II Supplement, amended and restated July 20, 2002, true and correct copies are corresponding attached hereto as Exhibits A and B.[1]

Local 502 and Motion Control negotiated a series of collective bargaining agreements covering the bargaining unit at the Ridgway Facility. The most recent collective bargaining agreement was effective by its terms from July 20, 2000 through June 27, 2003 (hereinafter the "2000 Agreement"). The 2000 Agreement contained the following provision regarding pension benefits:

> Section 1: Effective July 1, 1997 the Pension Plan will be as follows:
>
> \*     \*     \*
>
> (b) Employees retiring between the ratification and the expiration of the Agreement shall be entitled to pension benefits and increases during the term of this Agreement as follows:
>
> | Amount per month | Per Year Service |
> |---|---|
> | Effective upon ratification | $29.00 |
> | July 1, 2001 | $30.00 |
> | July 1, 2002 | $31.00 |

This provision of the 2000 Agreement, regarding the monthly pension multiplier, was effectively incorporated into the Plan.

---

[1] The 1997 Plan and the Part II supplement were attached as Exhibits to Plaintiffs' Compliant and also as Exhibits to Defendants' Motion for Summary Judgment. Plaintiffs will not re-introduce the Plan Documents as exhibits to their Motion for Summary Judgment in order to avoid unnecessary duplication.

During the term of the 2000 Agreement, Motion Control ceased production at its Ridgway Facility and permanently laid off all of the employees represented by Local 502, including Donachy and Kinley. The last day of production work was January 11, 2002, and the employees received WARN Act [29 USC 2101 et seq.] pay and benefits through March 16, 2002. There were approximately 127 employees affected by the plant closing.

Donachy and Kinley were both actively employed by Motion Control as regular, full time employees, working forty (40) hours per week, at the time the plant closed. They each received 480 hours of compensation of WARN Act pay from January 12, 2002 through March 16, 2002 for hours not actually worked. Motion Control maintained health insurance benefits for Donachy and Kinley from January 12, 2002 through March 16, 2002, as though they were actually employed.

In October or November of 2002, Motion Control paid Donachy for 108 hours of vacation pay he had accrued under the 2000 Agreement for the period of September 12, 2000 through September 12, 2001. This vacation pay was computed based on the wage rate specified in the 2000 Agreement as effective July 1, 2001. In October or November of 2002, Motion Control paid Kinley for 24 hours of vacation pay he had accrued under the 2000 Agreement for the period of April 10, 2000 through April 10, 2001. This vacation pay was computed based on the wage rate specified in the 2000 Agreement as effective July 1, 2001.

In the fall of 2003, Motion Control paid Donachy for 136 hours of vacation pay he had accrued under the 2000 Agreement for the period of September 12, 2001 through March 16, 2002. This vacation pay was computed based on the wage rate specified in the 2000 Agreement as effective July 1, 2002. In the fall of 2003, Motion Control paid Kinley for 240 hours of vacation pay he had accrued under the 2000 Agreement for the period of April 10, 2001 through

March 16, 2002. This vacation pay was computed based on the wage rate specified in the 2000 Agreement as effective July 1, 2002.

Both Donachy and Kinley retained recall rights under the collective bargaining agreement between Motion Control and Local 502 from the date the plant closed until the expiration of the collective bargaining agreement on June 27, 2003.

After the plant closing, Local 502 filed a grievance regarding Motion Control's application of the pension multiplier. Motion Control and Local 502 negotiated a settlement of that grievance that in part provided:

> 2.      The Company agrees that any employee who retires or who has retired by applying for benefits under the pension plan between July 20, 2000 and June 27, 2003, will receive, effective July 1, 2002, a multiplier of $31.00 per year of service.

Donachy and Kinley subsequently inquired of Motion Control whether employees who applied for retirement following the expiration of the 2000 Agreement would receive the final multiplier of $31.00. Motion Control responded that employees who retired after the expiration of the 2000 Agreement were not covered by the grievance settlement agreement and denied Donachy and Kinley the $31.00 per month pension multiplier. Neither Motion Control nor the Retirement Plan ever offered any further explanation to Donachy or Kinley regarding the denial of the $31 pension multiplier prior to the initiation of this action.

Donachy and Kinley subsequently initiated the instant lawsuit pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), on behalf of themselves and similarly situated employees, seeking a declaration that they are entitled to receive pension benefits computed at the $31 per month multiplier, attorneys' fees, and costs.

**III.   ARGUMENT**

    **A.   Standard of Review on a Motion for Summary Judgment**

A party is entitled to summary judgment when the record demonstrates no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Romero v. SmithKline Beecham*, 309 F3d 113, 117 (3rd Cir. 2002); *citing:* Fed.R.Civ.P. 56. Where "the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial'". *Rendulic v. Kaiser Aluminum & Chemical Corporation*, 166 F.Supp.2d 326, 332; *quoting:* *Matsushita Electrical Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L.Ed.2d 538, 106 S. Ct. 1348 (1986).

    **B.   Plaintiffs' Motion for Summary Judgment must be granted because the undisputed material facts demonstrate that, as a matter of law, Donachy and Kinley are entitled to receive a retirement benefit computed based on the $32.00 multiplier.**

        1.   <u>The District Court should review Plaintiffs' claims for pension benefits de novo</u>.

ERISA Section 502(a)(1)(B) permits a participant or beneficiary to bring a civil action to recover pension benefits, to enforce rights under the terms of the pension plan, or "to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §§1132(a)(1)(B). Donachy and Kinley filed this lawsuit to clarify whether they are or are not entitled to receive the $31 pension multiplier on retirement.

In evaluating these claims, the district court must decide by what standard it will review the determination of the Plan regarding the disputed benefits. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court delineated two possible standards of review for a court to use when reviewing a plan administrator's

determination regarding a participant's entitlement to employee benefits under the plan -- such claims must be reviewed under either a *de novo* standard or the arbitrary and capricious standard. *Id.,* 489 U.S. at 115. Under *Firestone,* "*de novo* review of a denial of benefits is appropriate only when a plan administrator has 'no discretionary authority to determine eligibility for benefits.'" *Romero v. SmithKline Beecham,* 309 F.3d 113, 118 (3d Cir. 2002); *quoting Firestone, supra.* If, however, the plan grants the plan administrator the authority to interpret the plan's terms and decide claims for benefits, a reviewing court may only rule against the plan if the administrator's determination was arbitrary and capricious. *Cefalo v. SmithKline Beecham,* 2000 U.S. Dist. LEXIS 22140*4 - *5 (W.D. Pa. 2000).

The Plan in this case grants discretionary authority to a pension Committee to administer the provisions of the Plan and to determine eligibility for benefits. Plan, §7.1-§7.3. It would seem, therefore, that the appropriate standard of review in this case would be to review the decision of the Committee regarding Donachy's and Kinley's claims to determine whether it was arbitrary and capricious.

The problem, however, is that the Committee never issued an explanation why it would not apply the $31 pension multiplier to Donachy, Kinley, and presumably all other former Motion Control employees in the same shoes as Donachy and Kinley as a consequence of the plant closing at the Ridgway facility. In fact, the first time Donachy, Kinley, or the undersigned received a written, reasoned explanation as to why the Plan refused to apply the $31 pension multiplier was when Motion Control and the Retirement Plan filed its Motion for Summary Judgment, and supporting brief, on November 4, 2005.

The United States Court of Appeals for the Third Circuit has come extremely close to adopting a rule in ERISA cases that where a plan administrator fails to furnish a written

explanation regarding a denial of benefits, no deference should be extended to the plan.  In *Skretvedt v. E.I. DuPont De Nemours and Company*, 268 F.3d 167 (3rd 2001), the employee benefit plan failed to offer any explanation to the participant for denying benefits until after litigation was commenced.  The Court, after noting that Section 503 of ERISA flatly requires plan administrators to set forth in writing the specific reasons for denying pension benefits, stated:

> We note in this regard our agreement with the policy concerns identified in *University Hospitals of Cleveland v. Emerson Electric Co.,* 202 F.3d 839 (6th Cir. 2000), where the court held that it would not defer to post hoc rationales for denying benefits claims generated for the purpose of litigation by ERISA plan administrators when those rationales did not appear in the denial letter sent to the benefits claimants or in the administrative record. The court observed that:
>
>> it strikes us as problematic to, on one hand, recognizes an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decisions after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review… To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them – or, worse yet, federal judges – to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.  *Id at 848 n.7*.

*Id. at 177*.

Despite a clear concern, the Court in *Skretvedt* considered the plan's post hoc rationales anyway, as it ultimately ruled in the participant's favor on the underlying issue of benefit

eligibility. The Court, however, clearly tipped its hand on how it would rule on the question if forced to: it would not permit plans to invent post hoc rationalizations in litigation to defend against benefit claims.

The only written explanation ever proffered by Motion Control regarding the denial of the $31 multiplier is attached as Exhibit 5 of the Complaint. In fact, in that letter Motion Control denies any entitlement to the $31 multiplier by claiming that the matter had been resolved through collective bargaining with Local 502, further asserting that this matter is *not* governed by "the plan document or any provision of ERISA". This explanation could not be any further from the argument advanced by Motion Control and the Plan in its recent Motion for Summary Judgment. Clearly, the latter is a post hoc rationalization composed by Motion Control and the Plan in defense of this litigation, and is not entitled to any deference in accordance with the reasoning set forth in *Skretvedt*. A *de novo* review is appropriate.

    2.    <u>Plaintiffs' are entitled to a deferred vested retirement benefit calculated at the $31 multiplier</u>.

Donachy and Kinley are not currently eligible for normal or early retirement benefits under the Plan because they cannot satisfy the age and service requirements for such a benefit. They are, however, entitled to a deferred vested retirement benefit from the Plan, as Motion Control and the Plan admit. Memorandum in Support of Defendants' Motion for Summary Judgment, p. 10 ("plaintiffs prospects for receiving benefits at age 65 plainly rise or fall based on the provisions of the Plan addressing Deferred Vested Retirement Benefits.")

The Plan describes a deferred vested retirement benefit in pertinent part as:

> **4.4 Deferred Vested Retirement Benefits**
>
> **(a)**   **Eligibility.** A Participant or Inactive Participant whose Vesting Service terminates after he attains his Vested Retirement Age and before his Early Retirement Age shall

8

> be eligible to receive a monthly deferred vested retirement benefit under the Plan, in accordance with and subject to the provisions of the Plan. Such eligible Member must file an application for a deferred vested retirement benefit in order to receive such benefit.
>
> **(b)** **Amount.** <u>A terminated Member's monthly deferred vested retirement benefit shall be an amount computed in the same manner as a normal retirement benefit, determined as set forth in section 4.1 (b) above, based on the benefit rate and his Credited Service as of the date his Vesting Service terminates</u>. If the deferred vested retirement benefit begins before the Member's sixty-fifth birthday, it shall be reduced for early commencement in the same manner as an early retirement benefit is reduced under section 4.2(b), or it shall be otherwise reduced as specified in the Supplement.

Plan §4.4. (Emphasis added).

Donachy and Kinley are entitled to a deferred vested retirement benefit that is "computed in the same manner as a normal retirement benefit" based "on the benefit rate and his Credited Service *as of the date his Vesting Service terminates*." In other words, the applicable benefit multiplier is the same as for a normal retirement benefit, but based on the date Donachy and Kinley's "Vesting Service terminates".

The parties agree on the analysis to this point. Motion Control and the Retirement Plan argue, however, that an "employee's Vesting Service necessarily terminates when his employment is terminated". Defendants' Memorandum in Support of Summary Judgment, p. 4. In other words, the Defendants argue that the day the plant closed (January 11, 2002), Donachy's and Kinley's vesting service terminated. Donachy and Kinley, argue, to the contrary, that the Plan contains clear provisions that allow them to accrue vesting service at least into 2003, but at any rate, beyond July 11, 2002 when the $31 pension multiplier became effective. The issue, simply, is when Vesting Service terminates.

The Plan defines the term "Vesting Service", in relevant part, as follows:

9

### 3.5 Vesting Service

The term "Vesting Service" (which prior to January 1, 1993 was also referred to as "Service") is used to determine whether an Employee's service prior to a Break in Service shall be reinstated if he is reemployed and to determine his eligibility for retirement benefits hereunder. An Employee shall receive credit for Vesting Service for his period of employment by the Employer and Affiliates determined in accordance with uniform and nondiscriminatory standards and policies adopted by the Committee, which standards and policies shall be consistently observed and applied, and which shall be subject to any modifications or exceptions specified in the Supplement applicable to his Participating Group: provided, however, that-

(a) Vesting Service shall be determined in completed full years and fractions of years in excess of completed full years.

\* \* \*

(c) <u>For employment on and after January 1, 1976, an Employee shall receive credit for a year of Vesting Service for each calendar year in which he has at least 83 1/3 Hours of Service. If an Employee has fewer than 83 1/3 Hours of Service for any calendar year he shall not receive credit for Vesting Service for that calendar year</u>.

Plan § 3.5; as modified by Plan Supplement § h. (Emphasis added).

The Plan clearly provides that for each calendar year that Donachy and Kinley accrue "83 1/3 Hours of Service" they receive credit for Vesting Service for that calendar year. If Donachy and Kinley earned a year of Vesting Service for 2002, they would have reached the $31 monthly pension modifier, as their vesting service clearly would not have terminated prior to July 20, 2002, when that benefit became effective.

The Plan defines what constitute "Hours of Service":

### 3.4    Hours of Service

The term **"Hours of Service"** means the hours of employment by the Employer and Affiliates for which an Employee receives credit for purposes of eligibility to participate in the Plan and determining

10

his Vesting and Credited Service under the Plan and which shall be subject to any modifications or exceptions specified in the Supplement applicable his Participating Group, as follows:

(a) **Hours Worked.** One hour for each hour for which the Employee is directly or indirectly paid or entitled to payment for the performance of duties during the applicable computation period for which his Hours of Service are being determined under the Plan. (These hours shall be credited to the Employee for the computation period or periods in which the duties were performed.)

(b) **Hours Paid but not Worked.** One hour for each hour in addition to the hours in subsection (a) above, for which the Employee is directly or indirectly paid or entitled to payment for reasons other than for the performance of duties during the applicable computation periods such as direct or indirect pay for: vacation, holidays, jury duty, a period of sickness or disability for which he is ordinarily compensated under the Employer's accident and sickness plan, and similar paid periods of nonworking time. (These hours shall be counted in the computation period or periods in which the hours for which payment is made occur.)

(c) **Involuntary Layoff.** One hour for each hour of involuntary layoff from employment with the Employer, as solely determined by the Employer under rules uniformly applied to all Hourly Employees in the Participating Group, up to the maximum period, if any, specified in the Supplement.

\*   \*   \*

When time records are not available or convenient for determining Hours of Service required to be credited under subsections (a), (b), (c), (d), (e) and (f) above, the Employee shall be credited with 190 hours for each month or portion thereof for which the Employee would be required to be credited with at least one Hour of Service. Hours of Service shall be determined in accordance with reasonable standards and policies adopted by the Committee in conformance with section 2530.200b-2(b) and (c) of the Department of Labor regulations, which are incorporated herein by reference.

Plan § 3.4.

According to the express provisions of the Plan, an employee's "Hours of Service" is the sum of: 1) all hours actually worked [§ 3.4(a)]; 2) hours of work lost due to "involuntary layoff with Employer" [§ 3.4(c)]; and, 3) hours for which the employee is compensated, even if not worked [§ 3.4(b)].

Furthermore, the monthly allotment of "Hours of Service" when "time records are not available or convenient" is 190 hours of service for each month the employee was entitled to receive an hour of service, according to the last paragraph of Section 3.4 of the Plan. Taking the actual Plan provisions into consideration, there are a number of ways of establishing that Donachy and Kinley achieved the requisite 83 1/3 Hours of Service entitling them to a year of Vesting Credit for at least 2002. Accordingly, and contrary to the Defendants' argument, their vesting service did not terminate prior to the $31.00 pension multiplier becoming applicable on July 20, 2002.

> a.  *Plaintiffs' Vesting Service did not break prior to July 20, 2002 because they received sufficient Hours of Service to receive a year of Vesting Service for calendar year 2002 by virtue of the "Involuntary Layoff" resulting from the plant closing.*

The plant closing, in connection with Section 3.4(c) of the Plan, would give all Motion Control employees, including Donachy and Kinley, sufficient hours to earn Vesting Service for at least the 2002 calendar year. That provision of the Plan grants an employee one hour of service for purposes of vesting "for each hour of involuntary layoff from employment with the Employer, …, up to the maximum period, if any, specified in the Supplement." The Plan Supplement, in turn, specifies the maximum period:

> (g) **Hours of Service.** Not more than 36 months of involuntary layoff and not more than 36 months of an approved leave of absence shall be recognized as Hours of

>> Service under section 3.4(c) of the Plan. No other modifications or exceptions to section 3.4 of the Plan.

Plan Supplement, § g.

In other words, the Plan documents provide that Donachy, Kinley (and every other similarly situated employee, for that matter) receive 36 months worth of "Hours of Service" by virtue of an "involuntary layoff". Clearly, Motion Control's decision to close the Ridgway facility where Donachy and Kinley were employed resulted in their involuntary layoff from employment.

Since Donachy and Kinley did not actually work after being laid off, time records "are not available or convenient" for determining the number of hours of service they should receive. Accordingly, Section 3.4 of the Plan provides that they each are to receive 190 hours for each month they were entitled to receive at least an hour of service. Donachy and Kinley are therefore entitled to a credit of 190 Hours of Service for 36 months under the provisions of the Plan due to their "involuntary layoff" in January of 2002.

Donachy and Kinley only need 83 1/3 Hours of Service in 2002 to receive vesting service for the entire year (thereby maintaining vesting service through July 2002 when the $31 pension multiplier became the effective). In fact, just one month's credit of 190 hours due to the involuntary layoff should have given them enough hours of service to earn them a year of vesting service for 2002, and preventing a break in vesting service until well after the $31 pension multiplier became effective.

> b.  *Plaintiffs' WARN Act pay earned them sufficient Hours of Service to receive a year of vesting service for 2002 and to prevent the termination of vesting service until after the $31 pension multiplier became effective.*

13

Donachy and Kinley received sixty (60) days of WARN Act pay, representing compensation for 480 hours that were not actually worked. Section 3.4(b) of the Plan provides that an employee gets one hour of service for each hour he is "directly or indirectly paid or entitled to payment for reasons other than for the performance of duties during the applicable computation periods". *Id.* The 480 hours of WARN Act pay that Donachy and Kinley were entitled to receive and that Motion Control paid falls squarely within this definition.

Accordingly, Donachy and Kinley also are entitled to at least 480 hours of service for 2002, more than enough to satisfy the 83 1/3 hours necessary to earn a year of vesting service. Again, since Donachy and Kinley received a year of vesting service for 2002, their vesting service did not terminate until well after the $31 pension multiplier became effective in July of 2002.

> c. *Plaintiffs' vacation pay earned them sufficient Hours of Service to receive a year of vesting service for 2002 and to prevent the termination of vesting service until after the $31 pension multiplier became effective.*

In 2003, Motion Control paid Donachy a sum of money equal to 136 hours for vacation benefits he had accrued through March 16, 2002. Around the same time, Motion Control paid Kinley a sum of money equal to 240 hours for vacation benefits he had accrued through March 16, 2002. In both instances, Motion Control used the applicable wage rate provided in the 2000 Agreement that went into effect July 1, 2002. Again, Section 3.4(b) of the Plan provides that an employee gets one hour of service for each hour he is "directly or indirectly paid or entitled to payment for reasons other than for the performance of duties during the applicable computation periods". *Id.* The hours of vacation pay that Donachy and Kinley were entitled to and that Motion Control paid for unused vacation pay accrued through 2002 again falls squarely within this definition.

Accordingly, Donachy and Kinley also are entitled to at least another 136 and 240 hours of service, respectively, for 2002, which is more than enough to satisfy the 83 1/3 hours necessary to earn a year of vesting service. For yet another reason, Donachy and Kinley are entitled to a year of vesting service for 2002, and their vesting service cannot be said to have terminated until well after the $31 pension multiplier became effective in July of 2002.

### IV. CONCLUSION

For all the reasons stated herein, Plaintiffs, Larry Donachy and Bruce Kinley, on behalf of themselves and others similarly situated, respectfully request that this Honorable Court grant their Motion for Summary Judgment, and enter judgment declaring them entitled to the $31 monthly pension multiplier, as well as attorneys' fees and costs.

    Respectfully submitted,

    JUBELIRER, PASS & INTRIERI, P.C.

    BY:    /s/ Jason Mettley
    Robert A. Eberle, Pa. I.D. #47359
    Jason Mettley, Pa. I.D. #81966
    219 Fort Pitt Boulevard
    Pittsburgh, PA 15222
    (412) 281-3850
    (412) 281-1985 (fax)
    rae@jpilaw.com
    jm@jpilaw.com
    Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of November 2005, a true and correct copy of the Brief in Support of Plaintiffs' Motion for Summary Judgment, was served on counsel for the Defendants identified as follows and in the manner indicated:

*Via electronic service through CM/ECF:*

>Richard A. Lanzillo, Esquire
>Knox, McLaughlin, Gornall & Sennett
>120 W. Tenth Street
>Erie, PA   16501-1461
>rlanzillo@kmgslaw.com

                                                                    s/Jason Mettley