1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    LARRY DONACHY, et al.,           :
                Plaintiff             :
4                                     :
        v.                            :   C.A. No. 04-245 Erie
5                                     :
     MOTION CONTROL INDUSTRIES,       :
6    et al.,                          :
                Defendant             :
7

8

9            Oral Argument Hearing in the above-captioned

10      matter held on Wednesday, December 14, 2005,

11      commencing at 1:24 p.m., before the Honorable

12      Sean J. McLaughlin, Courtroom C, at the United States

13      Courthouse, Erie, Pennsylvania 16501.

14

15

16   For the Plaintiffs:
          Jason Mettley, Esquire
17        Robert A. Eberly, Esquire
          Jubelirer Pass & Intrieri, PC
18        219 Fort Pitt Boulevard
          Pittsburgh, PA 15222-1576
19
     For the Defendants:
20        Richard A. Lanzillo, Esquire
          Knox McLaughlin Gornall & Sennett, PC
21        120 West 10th Street
          Erie, PA 16501
22

23

24

25            Reported by Janis L. Ferguson, RPR

1                          I N D E X

2

3    TRANSCRIPTS OF PROCEEDINGS  . . . . . . . . . . . . . . . 3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We have for consideration today

2    cross-motions for summary judgment at 04-245.  I have had

3    the opportunity to read the briefs and reply brief and get

4    through the record, such as it is.  I think the Defendant

5    filed its motion first.  Mr. Lanzillo?

6          MR. LANZILLO:  Thank you, Judge.  Your Honor, as

7    the Court has no doubt discerned, reviewing the papers,

8    there are really two threshold issues.

9          THE COURT:  Well, let me start with one, which you

10   may be about to mention.  And that's the question of

11   exhaustion.  And I want to see if I can figure out what's

12   going on here, because it looks for all the world like both

13   sides of the ships passing in the night.  Maybe.  I don't

14   know.  But this is why this argument is going to be

15   particularly helpful.  Should be particularly helpful.

16          Let me see if I understand your position.

17   Your position now is that the original claim that the

18   Plaintiffs made and the claim as sketched in the Complaint

19   is a claim that they should be entitled to normal retirement

20   benefits upon the attainment of age 65, such that it would

21   carry with it a multiplier of $31.  Is that correct?

22          MR. LANZILLO:  That's correct, Your Honor.

23          THE COURT:  You don't have to tell me more right

24   now.  That's number one.  And in response to Plaintiffs'

25   contention, the Plaintiffs come on and file their brief.

1    And among the things that they asked me -- this is a lump

2    question.  But be that as it may.  One of the things

3    Mr. Eberle asked me to do is to essentially apply the de

4    novo standard of review on the basis that the reason or

5    reasons that you articulated in your brief were never

6    articulated by the plan or the plan administrator or much

7    less Richard Perhacs.  I agree with that, by the way, as a

8    side issue.  At least it appears to me.

9                    You then come back -- I'm showing you how

10   twisted this knot has become.  You then come back and say to

11   me, well, that's preposterous, because how can we be accused

12   of coming up with a position for the first time when it's he

13   who is coming -- the Plaintiffs are coming up with the

14   position for the first time.

15                   Is that accurate so far, in broad brush?

16           MR. LANZILLO:  In broad brush, Your Honor.

17           THE COURT:  All right.  I'm not going to hold you

18   to that.  Now, let me go back and ask some specific

19   questions.

20                   I, in response to the Plaintiffs' claim for

21   normal -- excuse me.  What do they call it?

22           MR. LANZILLO:  Normal retirement benefits.

23           THE COURT:  Normal retirement benefits.  The only

24   thing I could -- well, let me ask you.  There was no formal

25   action on this by the Plaintiff with respect to the original

1    request, was there?

2            MR. LANZILLO:  There could -- no.  And there could

3    not have been, because this was presented not by Mr. Kinley,

4    not by Mr. Donachy.  This was presented by a Union as part

5    of a grievance, Your Honor.  You commented about Mr.

6    Perhacs' rationale, which was in a totally different

7    context, representing only Motion Control in the context of

8    a grievance.  The difference here is, Your Honor, is the

9    plan is now a party to the litigation.  Motion Control is

10   not synonymous with -- is not synonymous with the plan --

11           THE COURT:  But Mr. Eberle, if memory serves,

12   wrote to Attorney Perhacs on behalf of -- was it on behalf

13   of Donachy and the other Plaintiffs?  I mean, look at the

14   letter.

15           MR. LANZILLO:  I have, Your Honor.  And I don't

16   think that it was on behalf of Mr. Donachy.  I would have to

17   look at the letter again.

18           THE COURT:  Well, let's look at it.

19           MR. LANZILLO:  But, Your Honor, my problem with

20   that, and why that cannot or should not impact or excuse the

21   failure to exhaust administrative remedies, is that that was

22   in the context of a grievance matter --

23           THE COURT:  Well, it may have been, but he then

24   goes on in the same letter, meaning Eberle, and says that

25   given the nature of the issue and general right of

1    individuals to seek a declaration of ERISA, it would be more

2    straightforward to proceed with a civil action and get a

3    binding determination as to those rights, et cetera.

4              And then, without reading the letter, Perhacs

5    comes back and says, in essence, this matter has already

6    been resolved by virtue of the settlement of the collective

7    bargaining grievance at 004(a), and the issue of the proper

8    multiplier is governed by the collective bargaining

9    agreement and not by the plan document itself or any

10   provision of ERISA.  Isn't the -- that's wrong.  That is an

11   incorrect statement, isn't it?  I mean, if you want to

12   really parse it.

13             MR. LANZILLO:  The way I interpreted that

14   statement --

15             THE COURT:  And let me tell you why, and then you

16   can tell me.  The terms and conditions of the collective

17   bargaining agreement, insofar as they relate to multiplier,

18   become part of a plan, don't they?  Are incorporated into

19   the plan?

20             MR. LANZILLO:  Yes.

21             THE COURT:  Now, tell me why -- and I'm not saying

22   that Mr. Perhacs, being what I think is perhaps inaccurate

23   here, is necessarily material one way or the other.  But if

24   he's not -- if he is not inaccurate, why is he not

25   inaccurate?

1              MR. LANZILLO:  Well, as I interpreted that letter,

2    Your Honor, he was speaking in terms of the termination of

3    the $31 multiplier.  That is uniquely something determined

4    through the collective bargaining process.

5                    However, in -- in determining how that

6    multiplier is going to be applied in a given situation to a

7    given participant, that is, as a matter of law, a matter of

8    plan interpretation.

9              THE COURT:  No question about it.  He's wrong.  I

10    mean, you have to go to the plan, don't you?  Where else

11    would you go?

12              MR. LANZILLO:  In order to resolve the issues

13    presented here, we have to go to the plan.

14              THE COURT:  All right.  Then my next question is,

15    then back comes Mr. Eberle on May 24th and says, in part --

16    he's asking for a clarification of the position.  He says,

17    "Regarding the exhaustion of administrative remedies, please

18    consider this letter to be a request by Messrs. Donachy and

19    Kinley for a determination of the proper multiplier to be

20    used in calculation of benefits."  And then he goes on.  "If

21    the pension plan requires these individuals to submit

22    applications directly, rather than through legal counsel,

23    please advise me so that I can instruct them to proceed."

24                    Do you interpret that as a request to

25    jump-start the exhaustion process?

1          MR. LANZILLO:  I do not.  It cannot be.  The plan

2    was not represented by Richard Perhacs.  He was not involved

3    in anything through that date.  I don't know whether Mr.

4    Perhacs responded to that or not.  But at that point, all --

5          THE COURT:  Are you saying Perhacs was just

6    representing Motion Control?

7          MR. LANZILLO:  That's correct.

8          THE COURT:  Why did he -- I mean, it's neither

9    here nor there.  Are you saying this information should

10   have, but never got on the plan?

11         MR. LANZILLO:  I don't know, Your Honor.  In the

12   context they were working with, it was part of a grievance.

13   We all kind of run home to what we know.  And what --

14         THE COURT:  Well, Perhacs apparently ran home to

15   what he knew -- and this is not being critical at all.  I'm

16   trying to understand why this thing stalled in space.  He

17   apparently was of the opinion, albeit mistaken, that this

18   was a matter exclusively for the collective bargaining

19   agreement.  Is that right?

20         MR. LANZILLO:  To the extent that the issues are

21   controlled here today by the collective bargaining

22   agreement, that's right.

23         THE COURT:  All right.  Now, getting back to the

24   exhaustion issue again, what -- and this is why this gets a

25   little unusual, because I'm going to be asking Mr. Eberle in

1    a minute.  It appears to me that the normal retirement

2    benefit claim has been implicitly withdrawn.

3            MR. LANZILLO:  I think it has.

4            THE COURT:  But whatever the merits of that are,

5    what more should he have done -- what was required of him to

6    exhaust?

7            MR. LANZILLO:  The plan is quite specific.  They

8    need to provide the data and the support for whatever

9    benefit they are claiming.  And the only benefit that has

10   ever been presented truly of record, up until the filing of

11   cross-motion for summary judgment, was a claim for normal

12   retirement benefits, which clearly on the face of the plan

13   is invalid.  If your vesting service terminates before

14   normal retirement age, which is defined as age 65, you can't

15   get those benefits.

16           THE COURT:  So you're saying that the original

17   claim was for that.  The new claim is an entitlement based

18   on deferred vested benefits.

19           MR. LANZILLO:  Which sends you into a completely

20   different analysis in terms of calculating the amount of the

21   benefit.  And, Your Honor, if you look at the original claim

22   for normal retirement benefits, you would have no doubt

23   noted that the claim was that when we reach regular

24   retirement age -- normal retirement age is age 65 --

25   whatever rate is in effect at that time controls.  Which is

1  likely to be the $31 rate, because there's not going to be

2  any further collective bargaining agreements.

3              If you switch ahead now and change -- switch

4  gears to deferred vested retirement, there are all sorts of

5  eligibility issues which are unclear on this record --

6         THE COURT:  Well, I know.  One of them, you say,

7  is age.  To me, that's easily cured.

8         MR. LANZILLO:  It's so much more than that, Judge.

9         THE COURT:  I realize that.  You know, here is

10  my -- I'm going to hear from Mr. Eberle next, and then I'm

11  going to let you come back up.

12             But insofar -- essentially, as I understand

13  the Plaintiffs' argument -- he's saying that we acquired

14  sufficient vested service under a number of different -- any

15  number of different theories, including you get one hour

16  vested service for each hour of involuntary layoff.  You

17  have -- we could have accrued it through the Warn Act.  And

18  I think the other one was vacation pay.

19             My question to you is this:  It's your

20  position that those issues had never been addressed before.

21  Is that correct?

22         MR. LANZILLO:  That's part of it, yes.

23         THE COURT:  And it's also your position that those

24  are precisely the type of issues that require precisely the

25  type of plan interpretation that exhaustion is meant to

1    enhance.  Is that correct?

2            MR. LANZILLO:  Yes.

3            THE COURT:  As counsel for the plan, would it

4    be -- based upon your response to -- substantive response to

5    those positions, would it be futile --

6            MR. LANZILLO:  No.

7            THE COURT:  -- for the Plaintiff to try to exhaust

8    now?

9            MR. LANZILLO:  It would not, Your Honor.

10           THE COURT:  Why not?

11           MR. LANZILLO:  It is -- on this record, I believe

12   you can, as a matter of law, conclude that the Plaintiffs

13   are not entitled to the $31 multiplier --

14           THE COURT:  How can I -- it's a jurisdictional

15   deficit, isn't it?  Then I would be doing precisely what

16   you're telling me I can't do.

17           MR. LANZILLO:  And I understand you see an

18   inconsistency there, and I anticipated that.  That argument

19   is --

20           THE COURT:  Either you're in for a penny or you're

21   in for a pound.  Either I can or I can't.

22           MR. LANZILLO:  One thing that I don't believe can

23   happen here -- there are matters that are acutely within the

24   province of the committee.  And let me go back for a moment.

25   I believe that the Plaintiff's position is incorrect

1    concerning how they are interpreting the terms credit and

2    service, vested service, years of service.  They are

3    trying --

4            THE COURT:  Well, you're not the plan

5    administrator.

6            MR. LANZILLO:  I am not.  That's correct, Your

7    Honor.  And I understand that the -- I think the most

8    appropriate treatment here would be dismissal without

9    prejudice to allow for exhaustion.  However, if the Court

10   were to take up that issue, I certainly don't want to forego

11   my opportunity to argue the way I see it.  But you're

12   correct.  I am here as counsel.  I am not the committee --

13   quite frankly, the committee is comprised of individuals who

14   meet on a regular basis, but who I haven't been -- they

15   don't -- like any other body, they cannot act individually.

16   They have to act collectively.

17           THE COURT:  All right.  Let me hear what

18   Mr. Eberle has to say.

19           MR. EBERLE:  Your Honor, I defer to more expert

20   knowledge; Jason Mettley from my office.

21           THE COURT:  All right, Mr. Mettley.

22           MR. METTLEY:  Good afternoon, Your Honor.

23           THE COURT:  Hello.  Do you concede, for purposes

24   of our discussion here this afternoon, that at no time did

25   the Plaintiffs request -- at no time until the brief was

1    filed, at no time did they request or demand entitlement to

2    the $31 multiplier based upon the two-fold contention that

3    they were entitled to it under the deferred vested

4    retirement benefits, and, further, that they had acquired

5    sufficient service to get them into the year 2000 through

6    one of those three ways I have just indicated?

7          MR. METTLEY:  No, Your Honor, the Plaintiffs never

8    articulated that theory until summary judgment.

9          THE COURT:  All right.  Now, would it also be fair

10   to say -- and there's nothing wrong with this, because a

11   ship sets sail on one legal tack and often comes to a new

12   tack, as the master determines that one may be more

13   advantageous than another.

14             It's true, isn't it, that the original

15   proposition that was put forward back then, when the demands

16   were made -- and also in the Complaint at Paragraphs 9 and

17   10 is a claim for normal retirement benefits upon the

18   attainment of age 65?

19         MR. METTLEY:  I think those paragraphs in the

20   Complaint, Your Honor, reference the fact that when they get

21   to age 65, they would be eligible for normal retirement.  I

22   would actually ask Your Honor that the Court focus its

23   attention on Paragraph 22 of the Complaint, which I think --

24         THE COURT:  Slowly, though, if you want to read

25   it.

1          MR. METTLEY:  Sure.  I'll read the whole --

2          THE COURT:  Well, actually, let me do you a favor.

3     Let me look at it.

4          MR. METTLEY:  Here, I found my spot, Your Honor.

5     "Donachy and Kinley believe and, therefore, aver that the

6     retirement plan --"

7          (Mr. Mettley interrupted by the reporter.)

8          MR. METTLEY:  "-- must calculate their retirement

9     benefits."  Not normal retirement benefits.  It says, "Must

10    calculate their retirement benefits, as well as the benefits

11    of all other employees who apply for their pensions after

12    June 27th, 2003, based upon the final multiplier in the 2000

13    agreement," $31 multiplier.

14              Your Honor, if I may, I would suggest to you

15    that before this claim found its way into a lawsuit, the

16    Plaintiffs asked for the plan administrator and Motion

17    Control Industries, the plan sponsor, to answer one

18    question.  When we retire, are we eligible for the $31

19    benefit.  I can't tell you right now, Your Honor -- well,

20    actually, I can tell you.  The Plaintiffs have never applied

21    for any type of benefit.  They have not applied for normal

22    retirement benefit, they have not applied for early

23    retirement benefit, they have not applied for a deferred

24    vested retirement benefit.  Those are three different kinds

25    of benefits that the plan provides.  The eligibility for all

```
 1   three different benefits are different.
 2          THE COURT:  But in fairness, though, clearly
 3   they -- and to this day, they haven't applied for any
 4   particular block.  What they were really asking for from the
 5   plan, if you will, was a declaration, wasn't it, as to what
 6   their future rights would be?
 7          MR. METTLEY:  Exactly, Your Honor.  And to finish
 8   my thought, whether it's a normal retirement benefit, an
 9   early retirement benefit, or a deferred vested retirement
10   benefit, all of those benefits are going to be calculated
11   based upon the pension multiplier.  What the Plaintiffs have
12   asked for from day one, and I believe consistently all the
13   way through this, is a declaration that whatever kind of
14   benefit they are subsequently deemed eligible for, that that
15   benefit be calculated in $31 multiplier.
16          THE COURT:  Clearly, that was the promised plan
17   they were looking for; the $31 multiplier.  But the wagon
18   train, if you will, that they were riding toward that
19   promised land was the normal retirement benefits.  Their
20   argument had never been couched heretofore in terms other
21   than normal retirement benefits, had it?  I see nothing in
22   the record -- and this is not a criticism.  But the way the
23   issue was initially joined, there was nothing -- there was
24   no claim that, based upon their years of -- based upon
25   the --
```

1            Let me make it more precise.  I see no claim

2    ever having been made to the company that they were entitled

3    or would be entitled to a $31 multiplier under the deferred

4    vested benefit provision of the plan.  Number one.  And

5    secondarily, that they would be entitled to that under one

6    of the three ways that their service would accrue, even

7    after their termination.  There was no demand made on the

8    company under that scenario, was there?

9            MR. METTLEY:  No.  They never articulated that

10   argument.

11           THE COURT:  All right.  Let me ask -- and now

12   we're getting down to basics of this thing.  I, as I look at

13   the record, I have no -- like I had in a hundred percent of

14   my other ERISA cases presently pending and/or decided in the

15   past, I have no decision, written decision from the plan

16   administrator addressing, if you will, point for point the

17   Plaintiffs' or the Claimants' contentions as to their

18   entitlement to a certain type of benefit.  Which is another

19   way of saying, I have no plan decision against which I

20   should apply whatever standard of review.  Which is another

21   way of me asking you this:

22               Why, for goodness sakes, given the history of

23   this thing as we have presently talked about it, isn't this

24   the classic case for me to send this back to thePl;aintiff

25   with some, perhaps, short time frame and direction within

1    which to address the issue, as it's presently teed up, in

2    all its complexity, with two possibilities?  Either the plan

3    then is going to award prospectively the $31 multiplier or

4    they will not.  But if they don't, the case comes back to

5    me, and then I can pass on it.  How can I do anything other

6    than that?

7              MR. METTLEY:  Well, because at this point, Your

8    Honor, I think it's futile.

9              THE COURT:  Why?

10             MR. METTLEY:  I don't know how, given the record

11   that's in front of you, it can be fairly said that Motion

12   Control of the plan had not had an adequate opportunity up

13   until November of this year, when we finally the first time

14   heard it, to answer our question with some explanation,

15   which is what a plan administrator, by the way, under the

16   regulations, the Department of Labor regulations, requires

17   them to do with a claim.  Like you said, all the other

18   pension claims -- certainly this thing, up until the point

19   it's gotten here, it came to you in a very sideways form.

20             THE COURT:  Not only sideways, but it came through

21   ducking and weaving in such a fashion that it appears to me

22   that everybody that got close to it, got confused as to what

23   the issue was.

24                  Wouldn't this have been a cleaner claim and

25   more appropriately teed up from a procedural standpoint, as

1    we stand in the courtroom today -- as you stand and I sit --

2    if the original letters that went out had said, look it, we

3    understand we're not normal retirees, and we will never and

4    can never be under the clear terms of the plan, but we are

5    deferred vested benefit retirees, and this is why our

6    service throws us into that $31 multiplier?  Wouldn't that

7    be cleaner, if that's what happened?

8            MR. METTLEY:  Your Honor, I want to answer your

9    question, because I don't want to be evasive.  But the way

10   that you asked the question of me implies that you have an

11   understanding that I don't think is consistent with our

12   position.

13           THE COURT:  That's all right.

14           MR. METTLEY:  We have never applied for a normal

15   retirement benefit or any other kind of benefit.  You know

16   why?  Because these individuals have to get to the point in

17   life where they decide, you know what, I now need these

18   retirement benefits.  It may be when they reach age 65.

19   And, Your Honor, if they do reach age 65 at that point in

20   time they are going to be eligible for normal retirement

21   benefits.  Or perhaps Mr. Donachy --

22           THE COURT:  That's not true.  Now, with all

23   respect, do you have the Defendant's brief with you?  The

24   original brief?

25           MR. METTLEY:  The original one?

1          THE COURT:  11/04.

2          MR. METTLEY:  Yes, I do, Your Honor.

3          THE COURT:  Turn to Page 5.  Now, halfway down --

4     I'm reading from the brief.  "Thus, the foregoing provisions

5     establish the following eligibility rules under the plan."

6     I'm going to read these three, and you tell me which, if any

7     of them -- with which any of them you disagree.

8               One, "A participant is entitled to receive

9     normal retirement benefits only if his vesting service

10    terminates on or after the date he reaches normal retirement

11    age, 65."  Do you agree with that?

12         MR. METTLEY:  I do.

13         THE COURT:  Plaintiffs can never -- right there,

14    they can never satisfy that prong, could they?

15         MR. METTLEY:  Sure they could.  When they turn age

16    65, later on down the line.  At some point, unless they die,

17    they are going to turn age 65.  And at that point, Your

18    Honor, they would be eligible to apply for benefits.

19              Pretend for a minute that Mr. Donachy is 22

20    years of age, when he's got -- the records -- he's actually

21    vested in the plan.  As a practical matter, he's not going

22    to apply for retirement benefits right now.

23         THE COURT:  But doesn't that presume that your

24    vesting service, however that term is interpreted, means

25    that for all practical purposes, you are working at the time

1   you turn 65?

2          MR. METTLEY:  I don't think so.  Well, for the

3   normal retirement benefit?  Yes, I agree with that.  It does

4   presume that.

5          THE COURT:  That's what I'm talking about.  The

6   normal retirement benefit.  You would agree that they are --

7   they would never be eligible for a normal retirement benefit

8   under the plan, under the clear language of the plan.  How

9   could it be otherwise?

10          MR. METTLEY:  Your Honor, the way I would read the

11   plan is that if somebody has a vested benefit, they reach

12   age 65, at that point their vesting service has terminated,

13   they would be eligible for a normal retirement benefit.  I

14   believe that to fairly go through all of the plan, what

15   you'll realize is there's two things you need to satisfy to

16   get that benefit; the age requirement, 65 years of age, and

17   the number of years of vesting service as well.

18          THE COURT:  Well, there's no trick to this

19   question, but I want to make sure we're on the same page.

20   The second part, "A participant whose vesting service

21   terminates before he reaches normal retirement age is not

22   entitled to receive normal retirement benefits, but may be

23   entitled to deferred vested retirement benefits, provided he

24   satisfies the vesting requirements of the plan."  Is that an

25   accurate statement?

1            MR. METTLEY:  Yes, that is.

2            THE COURT:  All right.  Well, then, per force,

3    neither of your Plaintiffs, under -- no matter how you turn

4    this Rubic's Cube, could ever be eligible for anything other

5    than deferred vested benefits.  Correct?

6            MR. METTLEY:  That may be correct, Your Honor, but

7    if I can --

8            THE COURT:  It either is or it isn't.  How could

9    it possibly not be correct?  I've got to figure out at least

10   where we know we stand, as opposed to where we might stand.

11           Do you concede that you win or lose on the

12   battlefield, that they are deferred vested benefit

13   beneficiaries whose service time has accrued sufficiently to

14   take them at least to the end of the year 2000?  Isn't that

15   where you win or lose this case?

16           MR. METTLEY:  To the end of 2002.

17           THE COURT:  2002.  I misspoke.  Isn't that true?

18           MR. METTLEY:  I think that's essentially the case.

19   And perhaps, Your Honor, the reason why I don't view this as

20   the distinction between normal retirement and deferred

21   vested as being a particularly large issue --

22           THE COURT:  Right.

23           MR. METTLEY:  -- is because they haven't applied

24   for a benefit yet, and the plan administrator has not said,

25   yes, you're not eligible for one and you're not eligible for

1  the other one.  From my standpoint, if you look at the plan,

2  if they do wait until age 65 and they file at that point in

3  time, perhaps because their vesting service did terminate

4  before 65, what they get isn't a normal retirement benefit,

5  it's a deferred vested retirement benefit.  But under the

6  plan, the amount of the benefit is going to be the same, and

7  it's going to be based upon the --

8           (Mr. Mettley interrupted by the reporter.)

9           THE COURT:  Too fast.

10           MR. METTLEY:  I'm going a little bit too fast for

11  you.

12            And I think what our clients have really been

13  looking for, for a long time, is what is the multiplier

14  going to be when we get there.

15           THE COURT:  Well, I think that that is a critical

16  question.  But let me just -- do both of your clients

17  qualify for deferred vested benefits?

18           MR. METTLEY:  Yes.

19           THE COURT:  How old are they?

20           MR. METTLEY:  I don't know their ages off the top

21  of my head, Your Honor.

22           MR. EBERLE:  Your Honor, Mr. Donachy turns 65 in,

23  I believe, 2017.  Mr. Kinley is right around the same age.

24           THE COURT:  I think I know the answer to this

25  question, but it just occurred to me.  Is this ripe?

1        MR. METTLEY:  Absolutely.

2        THE COURT:  Why?

3        MR. METTLEY:  Because they have asked the plan

4    sponsor specifically -- and I think fairly that information

5    should have made its way to the plan administrator, because

6    it was clearly -- the questions clearly articulate to the

7    plan's sponsor, Motion Control, are we entitled to the $31

8    benefit, and --

9        THE COURT:  You misunderstood my question.  It was

10   a bad one.  By all events, neither Plaintiff would be

11   entitled to a $31 multiplier until attaining age 65.  Is

12   that correct?

13       MR. METTLEY:  No, I don't think that is correct.

14       THE COURT:  When would they be entitled to it?

15       MR. METTLEY:  The plan says that --

16       THE COURT:  As a deferred vested benefit

17   beneficiary, when would they be entitled to it?

18       MR. METTLEY:  Whenever they apply.  If they apply

19   and they satisfy the criterion -- which I think the deferred

20   vested is only going to have five years of vesting service,

21   which they already have.  They could apply tomorrow, they

22   could apply five years from now --

23       THE COURT:  All right.  Now, getting back to my

24   original point, it's accurate to say that they asked for a

25   declaration from the plan, if you will, that they would be

1    entitled to a $31 multiplier upon the -- originally asked,

2    for a declaration that they would be entitled to a $31

3    multiplier upon the attainment of age 65.  Isn't that right?

4              MR. METTLEY:  I don't agree with that.  I think

5    that --

6              THE COURT:  Why is it in your Complaint, then, at

7    paragraphs nine and 10.  See, part of the problem here is

8    this record is so barn sketchy as to what happened way back

9    when.  It does say that, does it not?

10             MR. METTLEY:  It said when they reach 65 years of

11   age they will be eligible for a normal retirement benefit.

12   If I may, Your Honor, I think the legal claim is found under

13   count one.  This is a one count lawsuit.  Paragraph 22 in

14   count one, what they are asking for, what they are

15   requesting is a declaration that individuals that retire on

16   or after June 27, 2003 --

17             THE COURT:  Slow.

18             MR. METTLEY:  Are entitled to a retirement

19   benefit -- doesn't specify which kind, based on the $31

20   multiplier.  And that's what my partner Eberle wrote.  That

21   is the same position he's posed in 22 letters he sent to

22   Motion Control.

23             THE COURT:  Isn't it true, though, that I find

24   myself in the difficult position of being asked to interpret

25   a plan in a rather -- with some rather sophisticated

1    arguments being made as to how one grows his or her years of

2    service under those three rationale, without the benefit

3    whatsoever of the plan itself and those people who are

4    supposed to be experts having had the opportunity to pass on

5    it in the first instance.

6              MR. METTLEY:  That is true.

7              THE COURT:  That's where I am.

8              MR. METTLEY:  That's where the Court is, Your

9    Honor.

10             THE COURT:  Now, unless -- and in the absence of

11   any earlier plan determination -- and it does seem to me, I

12   have to tell you, that Mr. Perhacs' letter was not addressed

13   toward the plan, it was addressed toward the collective

14   bargaining issues.  But be that as it may, in the absence of

15   any earlier determination from the plan from which I could

16   glean some type of fixed opinion, such that any further

17   effort on your part would be futile, why aren't I required

18   under Third Circuit law here to send you back to the plan

19   under a relatively short time period, three weeks, four

20   weeks, to get a formal determination, and then if you don't

21   like it, come back and have it out here with me?  Isn't that

22   the appropriate way to do this?

23             MR. METTLEY:  I think that opportunity has already

24   been afforded, Your Honor, and I think our clients, after

25   all this time, are entitled to have that answered.  So --

1        THE COURT:  Is that because -- and I fault you not

2   in the least for that.  But is that because by all events,

3   you would prefer a de novo review by me, as opposed to an

4   arbitrary and capricious review by me?

5        MR. METTLEY:  Well, to be perfectly honest, I

6   think the plan language that's involved here is so

7   straightforward, I'm not sure that it's going to benefit the

8   Defendants to have the higher standard of review.  So I

9   don't think this is -- I'm not pitching this argument to

10  you, Your Honor, from a strategical standpoint.  Certainly

11  in these kinds of cases you do argue over the standard of

12  review.

13        Genuinely, you know, the last letter in the

14  chain was from Mr. Eberle, again establishing, if we retire

15  after that date in 2003, do we get the $31 multiplier.

16  There was not a response to that letter.  That letter was

17  May 24th, 2004.  The Circuit clearly says that if it becomes

18  futile at a point, then we can come into Federal Court and

19  petition to have these rights clarified.

20        I agree that it's unfair to Your Honor; that

21  you don't have the opportunity to see some decision-making

22  before it got to you, but I think it's properly here, and it

23  should be decided.

24        THE COURT:  I'm going to now move off the

25  procedure, and I am going to spend a little bit of time on

1    substance, but I'm going to pick that up with Mr. Lanzillo,

2    then I'll let you -- we are now going to be talking about

3    your theory as to entitlement under deferred vested

4    benefits.

5          MR. METTLEY:  Thank you, Your Honor.

6          THE COURT:  All right.  Mr. Eberle, I have never

7    seen you so quiet in all the times you have been up here.

8          MR. EBERLE:  This is tough, Your Honor.

9          MR. LANZILLO:  Your Honor, just a couple points of

10   clarification.  Whether you're asking for deferred vested

11   retirement benefits, normal retirement benefits, disability

12   retirement benefits, early retirement benefits, it's

13   critically important to how you calculate the benefit and

14   whether the $31 multiplier applies.  That's why exhaustion

15   is so important here.

16          The way the question has been phrased here

17   today is that we should have discerned a general request to

18   let us know -- you know, Motion Control, get in touch with

19   the plan and tell us where we stand.  You know, what are our

20   rights under the plan.  In order --

21          THE COURT:  So you're saying that the request

22   wasn't sufficiently and narrowly crafted.  Is that what

23   you're saying?

24          MR. LANZILLO:  It was not.  The possibilities --

25   it would be unfair to say --

1        THE COURT:  Well, I can see the possibilities are

2   endless, because I have the arguments now that are put out

3   before me.

4        MR. LANZILLO:  That's correct, Your Honor.  And

5   they go in so many different directions here.  I mean,

6   whether they are asking for normal retirement benefits --

7   and it's not just deferred vested retirement benefits.  No

8   one has talked about them, so I didn't want to complicate

9   things further.  But someone could hypothetically say I'm

10  entitled to early retirement benefits.  Well, disability

11  retirement benefits is a bit too hypothetical.

12       But the analysis goes off in different

13  directions, depending on what you're asking for.  And that's

14  the first question.  The next issue is timing; when are you

15  submitting your claim.  Depending on -- and how is it -- you

16  know, where does it fit relative to your age.  Depending on

17  how -- which question is being posed will direct you to the

18  proper analysis or the benefit multiplier.

19       Let me just give one example.  Paragraph L

20  from the supplement makes a very, very prominent distinction

21  between how you handle increases in the benefit multiplier,

22  depending on whether you're asking for normal retirement

23  benefits versus deferred vested retirement benefits.  That's

24  just one of the plan interpretation issues.

25       Then, of course, you have all of the factual

1    issues, as far as hours of service credit.  Some things are

2    added, some things are deducted.  It depends on whether

3    you're looking at it from the perspective of credited

4    service, versus vested retirement service.

5                    I'll tell you, the first time I read this

6    plan, first I thought I needed to go get a CAT scan, because

7    it caused brain damage.  Then I thought it was just poor

8    drafting; that this was a piece of garbage put together.

9    But the third and fourth time I read it, it struck me as

10   almost a work of brilliance. I mean --

11           THE COURT:  Brilliant obfuscation or real

12   brilliance?

13           MR. LANZILLO:  Real brilliance.  I mean, this

14   thing -- now, only after reading it 15 times, am I starting

15   to appreciate the structure of this.

16           THE COURT:  All right.  Well, you know, you can

17   pay homage to -- I'm not sure where that gets us.  I mean,

18   let's assume -- well, I'll tell you where it gets us.  Let's

19   go here:  This is the $64,000 question, I think.  And

20   perhaps Mr. Mettley would agree with me or not.

21                    But as this thing now is teed up, the

22   critical question is when does an employee's vesting service

23   terminate, it seems to me.  And the corollary of that is,

24   can you continue to accrue vesting service when you're no

25   longer there, when the plant has closed down.

1             Now, with those questions, tell me why the

2    Plaintiffs' theory, that notwithstanding the -- what they --

3    well, first of all, was this an involuntary layoff?

4             MR. LANZILLO:  It was a termination.  It was a

5    permanent layoff.  Not the type of layoff where it's

6    contemplated for recall, which is treated differently.

7             THE COURT:  All right.  A permanent layoff because

8    there's nothing to go back to.

9             MR. LANZILLO:  Yes.  The plant is gone.  The plant

10   has been shut down.

11            THE COURT:  That having been said, why -- and in

12   getting to the merits here, I am in no way

13   suggesting that -- I think I have got jurisdiction of this

14   thing, but as long as you folks are here, I might as well

15   hear what you have to say.  Why are the Plaintiffs wrong

16   that in one form or fashion they didn't accrue sufficient

17   hours of vesting service to take them to at least the end of

18   2002, at which point, by their argument, this $31 multiplier

19   would kick in?

20            MR. LANZILLO:  You're mixing two related, but

21   distinct questions to get to the wrong answer.  When you

22   talk about when vesting service terminates, you look at --

23   the latest that someone's vesting service in this particular

24   case could terminate was at the end of the Warn Act hours.

25   It probably terminated as of January 11, 2002, but for

1    argument purposes let me say that -- let me concede, for

2    argument only, that it terminated in March of 2002.  You

3    look -- that is it.  That's when their vesting service is

4    fixed.  They may get additional hours added on, which will

5    allow them to get one more year of vesting service to get to

6    the five necessary to vest some form of benefit, depending

7    on what they are asking for.  Different question than when

8    vesting service terminates.

9                   And their service -- their vesting service

10   terminated as of March of 2002.  It's at that point when you

11   tally up all the hours and see whether they have --

12              THE COURT:  For the record, that's when the plant

13   closed?

14              MR. LANZILLO:  The plant shut down operations

15   January 11.  Kept a skeleton crew on to shut things down.

16   It paid its employees through -- I believe it was March 16,

17   2002.  Now, distinguish that --

18              THE COURT:  Is vested service defined under the

19   plan?

20              MR. LANZILLO:  Section 3.5.

21              THE COURT:  How does it define that?

22              MR. LANZILLO:  I am not that good.  It's a fairly

23   long --

24              THE COURT:  All right.  Well, maybe you can tell

25   me, in essence, what it says.  Does the plan address the

1    question as to how one accrues vesting service?

2            MR. LANZILLO:  It does, Your Honor.  But here is

3    the critical thing about vesting service:  Vesting

4    service -- and this is right in the first -- I can tell you,

5    this is in the first line or two of the definition.  And

6    it's not a simple definition.  It deals with multiple

7    situations.

8            But the critical language is this:  Vesting

9    service is used to determine eligibility.  That's the key

10   term.  If you want to determine benefit, you have to look at

11   credited service.

12           The plan fixes the multiplier as of the date

13   vesting service terminates, which, in this case, was no

14   later than March of 2002.  That tells you -- that's when you

15   measure the hours of service and crediting service.  Then

16   you have to go to crediting service, which the definition of

17   crediting service is Section 3.6 -- it's 3.5 for vesting

18   service, 3.6 for crediting service.  That tells you how to

19   calculate the amount of the benefit, and it gives you all

20   sorts of additions and deductions to hours, but they are

21   really two different questions.

22           What the Plaintiffs have done wrong is they

23   have tried to mix them together to say that -- here is their

24   argument, as I understand it:  They are saying that as of

25   the end of our Warn Act hours, we had more than 83 and a

1    third hours, which is what they need under the plan

2    supplement to get one year of vesting service.  Different

3    question.

4              They are saying, therefore, it's just like we

5    worked until the end of the year.  That's not right.  They

6    get a year of vesting service.  What you have to do is go

7    look at 3.6 for credited service, and that has a very

8    complex formula which they -- and in that formula they have

9    to get over 500 hours to get into credit, and then there are

10   deductions.  No matter how you play out credited service,

11   they can't get to July 20, 2003.

12             THE COURT:  Is it, in a nutshell, your position,

13   at least, on behalf of the plan right now, that -- that the

14   operative date for termination insofar as taking a snapshot

15   as to when the Plaintiffs -- as to what multiplier the

16   Plaintiff is entitled to, is -- would it be the date they

17   received their last paycheck?

18             MR. LANZILLO:  I wouldn't characterize it that

19   way.  I mean, the way --

20             THE COURT:  Or is it the last date they walked out

21   of the building?  Or what is it?

22             MR. LANZILLO:  No later than March 16, 2002,

23   because -- and I'm extrapolating from the Warn Act.  I mean,

24   you can have two scenarios in the Warn Act, as the Court is

25   well aware.  You can either give them 60-days' notice and

1    then end it there, or you can, in lieu of notice, pay them

2    the last 60 days.

3          THE COURT:  But however you look at it, it is at

4    that point in which the employer/employee relationship

5    terminates.  Is that right?

6          MR. LANZILLO:  Correct.  I think that's a fair

7    characterization, Judge.  And that is when all the rights

8    are fixed.  Now, you may go back and do calculations, you

9    may look at giving them extra hours to get them to the hours

10   they need to get that last year of service to qualify for a

11   pension, but things terminate.  Their vesting service --

12   they can have no vesting service after that date, even

13   though they might be credited or might not be credited with

14   additional hours.

15         THE COURT:  Now, this may be neither here nor

16   there, but you weren't involved in this collective

17   bargaining settlement.  I presume Mr. Perhacs was.

18         MR. LANZILLO:  That's correct.

19         THE COURT:  All right.  Do you know anecdotally

20   from Mr. Perhacs or from some other source whether folks

21   like these Plaintiffs became -- were considered or talked

22   about in connection with this ultimate resolution?

23         MR. LANZILLO:  I don't, Your Honor.  It ceased to

24   be a collective bargaining grievance issue, went into

25   litigation, got kicked down to me.  I looked at that

 1   Settlement Agreement --

 2             THE COURT:  I'm not even sure what it means.

 3             MR. LANZILLO:  Well, you know, it uses a phrase --

 4   it uses the word "retires" during a certain period of time,

 5   which is --

 6             THE COURT:  First of all, it looks like somebody

 7   drafted it longhand.

 8             MR. LANZILLO:  Yeah.

 9             THE COURT:  I mean, I --

10             MR. LANZILLO:  I don't know.

11             THE COURT:  I don't know.  I'm just trying to get

12   some insight.  All right.  Let me hear from -- all right.

13             How do you grow into the -- if the plant

14   closed on January 16th, 2002, how did your people acquire

15   sufficient service, vesting benefit service, to take them,

16   by your lights, at least to the end of 2002, and by my

17   calculations, under the best case scenario, it could take

18   them out five years, or something like that.  Right?

19             MR. METTLEY:  I don't know about five years, but

20   certainly for 2002.

21             THE COURT:  Well into 2003 or beyond.  Tell me the

22   three -- let's talk about the individual ways.

23             Now, they get 83 1/3 hours of service -- if

24   they had 83 1/3 hours of service in any year, do I

25   understand that they -- by your lights, they receive vesting

1    credit for that year?

2            MR. METTLEY:  Absolutely.

3            THE COURT:  All right.  So would it be your --

4    your point, then, is that one year of vesting service, as

5    you interpret that, would take them through 2002 and get

6    them to the $31 multiplier.

7            MR. METTLEY:  I think if you look at the

8    supplement, it defines the relevant provision regarding

9    vesting service.  It says that an employee shall receive

10   credit for a year of vesting service for each calendar year

11   in which he has at least 83 1/3 hours of service.

12               Our argument is, is under any one of three

13   different ways of looking at it, they receive 83 -- or

14   should have received 83 1/3 hours of service for 2002.

15   Therefore, they get a year of vesting service for 2002.

16               How you can then say that their vesting

17   service actually terminated during that year, I do not see

18   support for in the plan.  I do not see that the plan

19   ascribes any particular relevance to the termination of the

20   employment relationship or layoff.

21           THE COURT:  Now, you say they get one hour of

22   vested -- and this is how you get your time.  You say they

23   get one hour of vesting service for each hour of involuntary

24   layoff.  Is that right?

25           MR. METTLEY:  That's correct.

1          THE COURT:  Well, my goodness gracious.  I mean,

2     in an esoteric sense, they will be on involuntary layoff

3     until the day they die.  When did you stop computing those

4     hours?

5          MR. METTLEY:  Well, Your Honor, in the supplement

6     it defines that provision of the hours of service.  And,

7     first of all, it defines the hours of service the same way

8     for credited service and vesting service.  Of course, we're

9     taking about vesting service.  On Page 2 of the supplemental

10    plan, it defines hours of service or modifies the

11    definition, and it says not more than 36 months of

12    involuntary layoff.  So I think that that provision would

13    certainly grant Plaintiffs a clear claim for three years of

14    vesting service.

15         THE COURT:  And the -- I think that's where I got

16    the three years.  I thought it was a little high, but -- and

17    then the Warn Act, basically your position is they would be

18    entitled to at least 480 hours of service, which is

19    obviously more than the 83 1/3 necessary to get you to --

20    that might have been where I came up with the number of

21    years.  That takes you out sufficiently; a significant

22    period of time.

23              In your brief at Page 9.

24         MR. METTLEY:  Yes, Your Honor.

25         THE COURT:  For the record it says, "Donachy and

1    Kinley are entitled to a deferred vested retirement benefit

2    that is," quote, "computed in the same manner as a normal

3    retirement benefit," close quote, "based," quote, "on the

4    benefit rate and his credited service as of the date his

5    vesting service terminates," close quote.  In other words,

6    the applicable benefit multiplier is the same as for a

7    normal retirement benefit, but based on the date Donachy and

8    Kinley's vesting service terminates.

9                Then you go on to say, "The parties agree on

10   the analysis to this point.  Motion Control and the

11   retirement plan argue, however, that an employee's vesting

12   service necessarily terminates when his employment is

13   terminated."

14               So I'm clear here, once again -- and I'm

15   going over ground that has been, I think, more than

16   adequately tilled.  All your entitlement eggs are placed in

17   the deferred vested benefit basket.  Isn't that right?

18          MR. METTLEY:  That's how it was phrased in our

19   brief.  If you're asking me the question, Your Honor, I

20   don't think that all those eggs lie in that basket.

21          THE COURT:  Whose brief is it?

22          MR. METTLEY:  No, it's my brief, Your Honor,

23   clearly, but I can't see --

24          THE COURT:  I'm not saying you can't have an

25   epiphany, because many times I have written things and

1   thought to myself, you know, maybe that isn't exactly what I

2   meant to say.

3           MR. METTLEY:  The reason -- I'm not backing away

4   from what I wrote in the brief.  I'm just saying that I

5   don't see that Donachy and Kinley's -- all their eggs are

6   necessarily in that basket.  The question is, do they get

7   the $31 benefit multiplier.  I think there are a lot of

8   different ways to skin a cat.

9           THE COURT:  To stick with my metaphor, what other

10  basket besides the deferred vested benefit basket could hold

11  those eggs?  Could they ever be classified as normal

12  retirees?

13          MR. METTLEY:  Possibly.

14          THE COURT:  How.

15          MR. METTLEY:  By reaching age 65 and applying for

16  benefit at that point in time.

17          THE COURT:  But that -- in all respect, that is

18  facially inconsistent with those provisions that we just

19  talked about a little bit earlier, isn't it?  Every now and

20  then you have got to put your sword down and agree on a

21  point.  I'm not saying you have to.  But doesn't it appear

22  that way, at least?

23          MR. METTLEY:  For the sake of argument, let's say

24  I agree with that.  At the end of the day, they are still

25  going to be calculated based upon the credit service and

 1   some pension benefit multiplier.

 2           THE COURT:  I'm not sure -- in broad brush, that's

 3   probably true.  But it's not just a question of differences

 4   around the fine edges.  For purposes of the resolution of

 5   this position, it is critically important, is it not,

 6   whether or not they are treated as normal retirees or

 7   deferred vested benefit retirees?

 8           MR. METTLEY:  I would --

 9           THE COURT:  Because the analysis is completely

10   different.  Completely different.

11           MR. METTLEY:  I don't think that it's completely

12   different.

13           THE COURT:  It's materially different.

14           MR. METTLEY:  I think it's somewhat different.  I

15   don't know that it makes that much of a difference, Your

16   Honor, because I really do view this as simply how old are

17   they when they apply and how many years of service do they

18   have.  And then we're going to compute the benefit.  You can

19   call it --

20           THE COURT:  But -- not to interrupt you, but clear

21   enough, this much is true:  That it would not be necessary

22   to jump through all those analytical hoops that we've just

23   talked about as to how your vesting service might continue

24   to accrue through some form or fashion.  It would not be

25   necessary to engage in that type of analysis if one was a

1    normal retiree.  Isn't that correct?

2              MR. METTLEY:  Yes, that probably would be the

3    case.

4              THE COURT:  All right.  Thank you.

5              (Discussion held off the record.)

6              THE COURT:  I'm going to get something out on

7    this.  I have no fixed opinion, but I have got to say, if it

8    should come to pass -- and I say if I conclude that it's not

9    appropriate for me to reach the merits, but it's appropriate

10   that this matter be dismissed without prejudice, given the

11   amount of time -- what is this, an '04 case?  Well, it's

12   getting older.  It would -- if I go that way, it would be

13   with an intention to -- with a direction to the plan to act

14   expeditiously on this, so -- if I do.  But that's an if.  I

15   don't know what I have to do.  We'll get something out.

16             MR. LANZILLO:  Your Honor, may I ask a question.

17   This may be important.  If the Court were to go in that

18   direction, how the question is phrased is critically

19   important to us.  And the way the plan is structured, if the

20   initial burden is on the Plaintiffs to tell us, you know,

21   what they are looking for -- because the analysis would

22   change dramatically depending on the benefit.  And to make a

23   threshold presentation of the basis for that claim, if I

24   could --

25             THE COURT:  Well, what you're asking for me to do,

1    if I go that way -- and this is going to bring me to another

2    point.  I'm glad you're raising this.  Is to direct the

3    Plaintiffs to, if you will, submit a clear declaration

4    question to the plan.  Is that right?

5            MR. LANZILLO:  Yes, Your Honor.  Including the

6    nature of the benefits they are looking for and when they

7    were proposed to have their benefits commence.  That's

8    another factor.

9            If they are looking to start prior to age 65

10   or some scenario where that can occur, well, the whole

11   calculation changes.  So -- and not to preempt my opposing

12   counsel.  The critical things we would need to know would

13   be, number one, what type of benefit do you contend you're

14   entitled to.  And I understand now that would be deferred

15   vested retirement; not early, not normal.  When would you

16   propose to commense the receipt of benefits for each

17   Plaintiff; at age -- presumably at age 65.  And then any

18   additional information as far as your position on years of

19   credited service, hours, and birth date information.  We

20   could dig that out, but it would be helpful to have that in

21   the declaration.

22           THE COURT:  Let's go off the record.

23           (Discussion held off the record.)

24           MR. METTLEY:  The problem, Your Honor, is that

25   beyond Mr. Donachy and Mr. Kinley are the remaining unspoken

```
 1    Plaintiffs, who are similarly situated.
 2              THE COURT:  Thank you.  That's a good point.  We
 3    have this punitive class standing behind these folks here as
 4    well.
 5              MR. METTLEY:  We could resolve Mr. Kinley and
 6    Mr. Donachy, but that would not necessarily resolve the
 7    Defendants' problems, because at some point later on down
 8    the line, some other individual who participated in the plan
 9    may decide that they want to apply for a benefit, and you
10    know what, they think they are entitled to a $31 multiplier
11    too.
12              THE COURT:  Well, this is just thinking off the
13    top of my head, but it would strike me that to the extent
14    that the punitive class members are sufficiently similarly
15    situated to be an appropriate class under Rule 23, the
16    decision as to one class representative would essentially be
17    the decision as to all, wouldn't it?  If they were in the
18    same shoes, pretty much.
19              MR. METTLEY:  Yeah, I would agree with that.
20              THE COURT:  But you're saying there's other folks
21    out there who may not be entirely similarly situated, and
22    they have different arguments to make?
23              MR. METTLEY:  Well, there is another set of
24    litigation involving this Plaintiff.  So, yes, I know that
25    to be true.
```

1          THE COURT:  All right.  Isn't that just a

2     situation where I cross that bridge when I get to it?

3          MR. METTLEY:  Perhaps.  Another problem I see with

4     Mr. Lanzillo's proposition about our clients having to set

5     forth all these particulars, that's requiring them to do

6     something that ERISA says they don't have to do.  ERISA says

7     a plan participant has the right to get a clarification as

8     to their rights under the plan.  They don't need to file a

9     claim.  They have the right to say, hey, when I retire, be

10    it at age 50, at age 65, whenever that may be, I want to

11    know what multiplier I'm entitled to.  I don't understand

12    why Mr. Kinley or Mr. Donachy would have to say today, I'm

13    going to retire on such-and-such a date in the future.

14         THE COURT:  Well, without getting too far into

15    niceties, I think in broad brush, the rule is that there at

16    least has to be a meeting of the minds or the issue has to

17    be sufficiently broadly joined so that the plan understands

18    in broad brush the basis upon which the applicant is seeking

19    a declaration or benefits.

20              It strikes me in this particular case,

21    though, Mr. Lanzillo, if it were to come to it going back to

22    the plan, I don't see the point of requiring the Plaintiffs

23    to do any more work than they have already done in their

24    brief.  It seems to me -- doesn't your brief, Mr. Mettley,

25    where it spells out their entitlement to the $31 multiplier

1   under the deferred vested benefit theory, doesn't that tell

2   the plan everything that it ever wanted to know, pretty

3   much?

4             MR. METTLEY:  It does.

5             THE COURT:  Well, that would be it.

6             MR. LANZILLO:  All right, Your Honor, as the

7   question was just phrased by Mr. Mettley, it's impossible to

8   answer the question.  Now, I will -- and I understand --

9             THE COURT:  Impossible to answer what question?

10            MR. LANZILLO:  This idea that we should try to

11  answer all of the hypotheticals --

12            THE COURT:  We don't have to.  Because if it comes

13  to that, you have a perfectly sketched-out position in the

14  Plaintiffs' brief.  What more -- in fact, it is probably

15  with more exquisite detail than is even required under

16  ERISA.  Isn't that right?

17            MR. LANZILLO:  I would not necessarily -- I would

18  not agree with that.

19            THE COURT:  Is the brief adequate --

20  hypothetically, is the brief adequate for the plan to

21  address it?

22            MR. LANZILLO:  I believe it is.  The only thing

23  that's not there is timing matters.  If I understand their

24  position in their brief, they want to know what the

25  multiplier would be as of normal retirement age, age 65,

1    calculating a deferred vested retirement benefit.

2                    I'm not trying to be difficult, Your Honor.

3    I just -- it matters in the calculation.  If they want to

4    take that benefit early, there's certain mechanisms that

5    allow them to do that.  For purposes of this -- this is all

6    hypothetical, because you're --

7                    THE COURT:  I haven't made any ruling.

8                    MR. LANZILLO:  But Your Honor pointed out on the

9    issue of -- they are not there yet.  They are not asking --

10    they are not applying for benefits.  So they have to give us

11    a hypothetical that is capable of response.

12                    THE COURT:  Well, what would that be?

13                    MR. LANZILLO:  As I --

14                    THE COURT:  No, I'm asking Mr. Mettley.  What is

15    it?

16                    MR. METTLEY:  I'm not sure I understand.

17                    THE COURT:  I'm not sure I do either.

18                    MR. METTLEY:  The monthly benefit, regardless of

19    the form of benefit -- and this was the point I was probably

20    not adequately conveying -- is the same.

21                    MR. LANZILLO:  That's wrong.  That's the problem.

22                    MR. METTLEY:  It's years of service times the

23    multiplier.  And if it's an early retirement benefit or a

24    deferred, then you actuarially reduce it from the normal.

25                    THE COURT:  Well, the mere fact you disagree with

1   the predicate, so what.  That happens all the time.  At

2   least you know what he's looking for.

3         MR. METTLEY:  They just want to know if they are

4   entitled to the $31 multiplier.

5         THE COURT:  But he's entitled to know on what --

6   you have to hang your $31 multiplier up on some plan hook.

7   I mean, otherwise, I don't know how they can address it.

8   And you already have, in my view --

9         MR. METTLEY:  We have picked the hardest way.

10        THE COURT:  You have picked the deferred vested

11  benefit hook.

12        MR. LANZILLO:  Your Honor, here's what I'll do:

13  Because I don't want to be difficult or protract this.  If

14  the committee gets to a point where they would think that

15  there is unanswered information that is necessary in order

16  to come to a decision, I'll identify that by counsel.  Or in

17  our response, I'll have them articulate an assumption

18  that -- on this particular issue, we are assuming, you know,

19  a retirement benefit commencing on each Plaintiff's 65th

20  birthday.  If that becomes necessary.

21        THE COURT:  All right.  Well, I'm going to get an

22  Order out on this one way or the other, hopefully with some

23  dispatch.  If it -- if I retain it goes to the merits, it's

24  going to be longer.  If it's resolved on the exhaustion

25  issue, obviously, it's going to be somewhat shorter.

1          But in any event, even if I resolve it there,

2     I expect to see this back again in rather short trip.

3          All right, thank you.

4

5          (Hearing concluded at 2:27 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25